# Illinois Official Reports

## Appellate Court

---

### *People v. Jones*, **2015 IL App (2d) 120717**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. OMARRIAN T. JONES, Defendant-Appellant. |
| | |
| District & No. | Second District<br>Docket No. 2-12-0717 |
| | |
| Filed<br>Rehearing denied | February 3, 2015<br>March 3, 2015 |
| | |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions for 12 counts of first-degree murder, attempted first-degree murder, 4 counts of home invasion, and residential burglary, the appellate court rejected defendant's contentions that the trial court erred in denying his request for a six-person jury, that the State's peremptory challenge of a potential African-American juror deprived defendant of a fair trial, and that his right to proceed *pro se* was violated and the court affirmed his contention that the one-act, one-crime rule required the vacation of all but 2 of his first-degree murder convictions, all but 1 of his convictions for home invasion and the residential burglary conviction. |
| | |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 09-CF-2703; the Hon. Ronald J. White, Judge, presiding. |
| | |
| Judgment | Affirmed in part and vacated in part. |

| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, and Jack Hildebrand, all of State Appellate Defender's Office, of Elgin, for appellant. |
| | |
| | Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. Justices Hutchinson and Burke concurred in the judgment and opinion. |

## OPINION

¶ 1    Following a jury trial, the defendant, Omarrian T. Jones, was convicted of 12 counts of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(3) (West 2008)), attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2008)), 4 counts of home invasion (720 ILCS 5/12-11(a)(1) (West 2008)), and residential burglary (720 ILCS 5/19-3 (West 2008)). He was sentenced to natural life imprisonment for the murder convictions, 30 years for the attempted murder conviction, 30 years for the home invasion convictions, and 15 years for the residential burglary conviction. On appeal, the defendant argues that: (1) the trial court erred in denying his request for a six-person jury; (2) he was deprived of a fair trial where the State's reasons for peremptorily excluding an African-American potential juror were inadequate and pretextual; (3) the trial court violated his right to self-representation; and (4) under one-act, one-crime principles, this court should vacate all but two of his convictions of murder, all but one of his convictions of home invasion, and his conviction of residential burglary. We affirm in part and vacate in part.

¶ 2                                    BACKGROUND
¶ 3    On August 26, 2009, the defendant was charged by indictment with 60 offenses for the first-degree murders of Reynato and Leticia Cardino (720 ILCS 5/9-1(a)(1), (a)(3) (West 2008)), the attempted first-degree murder of their son, Reyle Cardino (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2008)), home invasion (720 ILCS 5/12-11(a)(1) (West 2008)), and residential burglary (720 ILCS 5/19-3 (West 2008)). The charges alleged that, on July 8, 2009, the defendant entered the Cardinos' home with the intent to commit a burglary. While in the home, he killed Reynato and Leticia with a hammer and he attempted to kill Reyle.

¶ 4    Three weeks before the trial started, the defendant requested to proceed *pro se*. The trial court admonished the defendant that, if he waived his right to counsel, the court was "going to proceed to trial and you won't be able to go back in the middle of trial and ask for a lawyer." The trial court then continued the proceedings for a day to allow the defendant to

discuss the matter with his counsel. On the following day, the defendant decided not to waive his right to counsel.

¶ 5        Shortly before jury selection, the defendant requested a six-person jury. The trial court denied the defendant's request, explaining that the supreme court rules required 12-person juries.

¶ 6        During *voir dire*, the first African-American venireperson to be questioned, Gwendolyn Barnett, stated that her husband was the pastor of Christian Faith Community Church, an "independent" church, and that she was active in the church. Barnett stated that she did not have any moral, religious, or philosophical reasons why she could not sit as a juror and that she would not have any hesitation in signing a guilty verdict. The prosecutor then asked Barnett if her church was of "a particular religion." Defense counsel objected, and the trial court sustained the objection. The State then, in open court, exercised a peremptory challenge and excused Barnett.

¶ 7        In chambers, defense counsel raised a challenge pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), and argued that the only difference between Barnett and the other jurors whom the State had already accepted was her race. The trial court found that the defendant (who is African-American) had established a *prima facie* case of purposeful discrimination. The prosecution responded that, because Barnett had stated that her church was "nondenominational," it wanted to ask her about her "faith, her affiliation with other churches." Further, because the trial court had sustained defense counsel's objection to the prosecutor's question, the prosecutor excused Barnett because she did "not know[ ] what her answers would be." Defense counsel responded that the State should go ahead and ask Barnett those questions. The prosecution answered that, because it had already excused Barnett in open court, Barnett would be prejudiced against the State if the prosecution withdrew its peremptory challenge and began questioning her again. The trial court determined that there had not been a *Batson* violation. The trial court explained that the State had brought out that Barnett was deeply rooted in her religion, and "if that's something the State wishes to exercise a challenge for that reason and not racial, that's their choice."

¶ 8        Caitlin LaChance, a white person who sat on the jury, stated during *voir dire* that she volunteered weekly at a soup kitchen and performed charity work with her church. She worked with Habitat for Humanity, was the assistant coordinator of the after-school program at her church, and went on "mission trips."

¶ 9        At trial, Reyle testified that, on the evening of July 8, 2009, he walked into his parents' kitchen. He saw the defendant, whom he had never seen before. The defendant told him, "You're dead." He then began fighting with the defendant and tumbled down the basement stairs. The defendant choked him, punched him, and threw objects at his face. While on the basement floor, he saw the defendant go up the stairs to the kitchen. The defendant then came back downstairs and pushed him over as he tried to stand up. The defendant then left the house. Reyle then went upstairs and out the front door. He had a neighbor summon the police.

¶ 10       Police officers discovered the bodies of Reynato and Leticia in a bathtub. A forensic pathologist determined that each had died due to multiple blunt force traumas to the head. Their injuries were consistent with being struck by a hammer.

¶ 11       The police found rubber gloves on the kitchen floor of the victims' home. A hammer was found in the sink of the bathroom where the bodies were found. A ski mask, purple shirt, and

hooded sweatshirt were found in the basement. The defendant's DNA was found on the ski mask and the right-hand rubber glove. A bite mark on Reyle's shoulder tested positive for the defendant's DNA.

¶ 12    The defendant testified that he lived a few blocks from the Cardinos and that he decided to burglarize it. He snuck into the house while people were still there. He hid in the basement. After everyone left the house, he went through each room of the house looking for items to steal. While he was in the master bedroom, he heard someone coming into the house, so he went back down into the basement. While in the basement, he heard someone attack the Cardinos. He went up the basement stairs, peered around the corner, and saw a man beating Leticia with a metal object. The defendant retreated to the basement. Later, he went back upstairs and was attacked by someone who placed a chokehold on him. He lost consciousness.

¶ 13    After regaining consciousness, he heard the garage door opening. Reyle came into the house and asked him what he was doing there. The defendant responded: "They're dead." Reyle grabbed a knife and swiped at him. They struggled and fell down the basement stairs. They continued to struggle in the basement. The defendant threw an object at Reyle's face, which caused Reyle to fall to the ground. Thereafter, the defendant left the house. He was able to hide from the police for several days before being arrested.

¶ 14    At the close of the trial, the jury found the defendant guilty of first-degree murder, attempted murder, home invasion, and residential burglary. Following the denial of his posttrial motion, the trial court sentenced the defendant to natural life imprisonment for first-degree murder and an additional 60 years for attempted murder, home invasion, and residential burglary. The defendant thereafter filed a timely notice of appeal.

¶ 15                                        ANALYSIS

¶ 16    The defendant's first contention on appeal is that he was deprived of a fair trial due to the trial court's failure to consider his request for a six-person jury. The right to a jury trial in a criminal case is guaranteed by both the federal and the state constitutions. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 13; *People ex rel. Birkett v. Dockery*, 235 Ill. 2d 73, 80-81 (2009). This constitutional right is codified in section 115-1 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/115-1 (West 2008)). Section 115-4(b) of the Code provides that "[t]he jury shall consist of 12 members." 725 ILCS 5/115-4(b) (West 2008). However, because a defendant can waive his entire right to a trial by jury, he can also waive his right to a jury composed of 12 members and proceed with fewer than 12. *Dockery*, 235 Ill. 2d at 78. If the defendant requests a jury of fewer than 12, the grant of that request lies within the sound discretion of the trial court. *Id.* at 80-81.

¶ 17    Where a trial court erroneously believes that it has no discretion in a matter, its failure to exercise discretion can itself constitute an abuse of discretion. *People v. Chapman*, 194 Ill. 2d 186, 224 (2000). The effect of such a failure to exercise discretion must be assessed in the context of the entire proceeding. *Id.* Not every error is of such magnitude that a new trial is warranted. *Id.* at 224-25. In other terms, before a defendant is entitled to a new trial based on the trial court's failure to exercise its discretion, the defendant must "prove that prejudice resulted from the trial court's failure to exercise its discretion." *People v. Ware*, 407 Ill. App. 3d 315, 349 (2011) (citing *Chapman*, 194 Ill. 2d at 223).

¶ 18    Here, the defendant does not make any argument as to how he was prejudiced by the trial court's failure to consider his request for a six-person jury. Indeed, since it is readily apparent that it would be more difficult for a group of 12 people to reach a unanimous verdict than it would for a group of 6 to reach such a verdict, the defendant's ability to establish such prejudice would be dubious at best.[1] Instead, relying on *People v. Partee*, 268 Ill. App. 3d 857, 869 (1994), the defendant argues that he does not have to establish prejudice at all. However, as *Partee* precedes our supreme court's decision in *Chapman* by six years, we find that *Partee* is not an accurate reflection of the current state of the law.

¶ 19    Alternatively, the defendant argues that prejudice should be presumed. The defendant contends that this case is analogous to *People v. Matthews*, 304 Ill. App. 3d 415 (1999). In *Matthews*, the court held: "[p]rejudice may be presumed where defendant was unaware of his right to a 12-person jury and neither agreed to nor acquiesced in a decision to waive the full number of jurors." *Id.* at 419-20. The defendant's argument is unpersuasive. The right to a 12-person jury is a fundamental right that will be afforded a criminal defendant unless he specifically waives that right. There is no similar fundamental right to a six-person jury. If there were such a fundamental right, the trial court could never deny the defendant his request for a smaller jury. However, the trial court clearly has that ability. *Dockery*, 235 Ill. 2d at 78. Accordingly, as set forth above, the defendant must establish prejudice in order to be entitled to reversal. As he does not, his argument as to this issue is without merit.

¶ 20    We next consider the defendant's argument that he was deprived of a fair trial because the State's reasons for peremptorily excluding the only African-American venireperson were inadequate and pretextual.

¶ 21    In *Batson*, 476 U.S. at 89-96, the United States Supreme Court held that the State violates the equal protection clause of the United States Constitution when it uses peremptory challenges to exclude members of a venire from jury service based upon their race. The Court set forth a three-part test to determine whether the State had committed such a violation. *Id.* at 96-98. "First, the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race." *People v. Easley*, 192 Ill. 2d 307, 323 (2000). "Second, if the defendant has made a *prima facie* showing, the burden then shifts to the State to provide a race-neutral explanation for excluding each venireperson in question." *Id.* at 323-24. During the second step, "the trial court focuses on the *facial* validity of the prosecutor's explanation. The explanation need not be persuasive, or even plausible." (Emphasis in original.) *Id.* at 324. The defense may then rebut the prosecutor's reasons as being pretextual. *Id.* "Third, the trial court *** weighs the evidence in light of the *prima facie* case, the prosecutor's reasons for challenging the venireperson, and any rebuttal by defense counsel" to "determine whether the defendant has met his or her burden of proving purposeful discrimination." *Id.*

---

[1]In a recent Chicago Tribune editorial, the newspaper editors commented on the benefits of a 12-person jury in comparison to a 6-person jury. The editors opined:

"Larger juries are more diverse, which means they're more likely to reflect the views of the broader community. The quality of their deliberations is higher–they have better collective recall of the testimony, and the debate is more rigorous. With more voices, it's less likely that a single juror will dominate the discussion and more likely that a dissenting juror will have an ally." Editorial, *Payday for Lawyers*, Chi. Trib., Dec. 15, 2014, § 1, at 16.

¶ 22    The exclusion of even one prospective juror based on race is unconstitutional and requires reversal of a conviction. *People v. Britt*, 265 Ill. App. 3d 129, 133 (1994). A reviewing court should not overturn a trial court's finding on the issue of discriminatory intent in the prosecution's use of peremptory challenges unless it is convinced that the trial court's determination was clearly erroneous. *People v. Champs*, 273 Ill. App. 3d 502, 506 (1995). Because discriminatory intent is a matter of fact and a question of credibility, the trial court's findings are afforded great deference on review. *People v. Martinez*, 297 Ill. App. 3d 328, 339 (1998). However, reviewing courts must attempt to make a meaningful assessment of the State's reasons for challenging venirepersons if *Batson* is to be followed in practice and not just in theory. *Id.*

¶ 23    Here, we cannot say that the trial court's determination that the State did not commit a *Batson* violation was clearly erroneous. After the trial court found that the defendant had presented a *prima facie* case that the State had exercised a peremptory challenge on the basis of race, the trial court directed the State to respond. The State explained that it wanted to question Barnett about her "faith." However, after the trial court sustained defense counsel's objection to its question regarding whether Barnett's church was of a "particular religion," it did not believe that it could ask that question. The State therefore decided to exercise a peremptory challenge because it did not know what Barnett's answer would be. The trial court accepted the State's explanation that its reason for wanting to exclude Barnett was not based on racial grounds, and therefore there had not been a *Batson* violation.

¶ 24    The defendant argues that the trial court's decision was clearly erroneous because it was based on error that the State introduced into the proceedings. Specifically, the defendant contends that the trial court never precluded the State from asking whether Barnett was affiliated with any particular religious group. The defendant also points out that the State was the party that chose to excuse Barnett in open court. He concludes that it therefore should not be allowed to complain that Barnett would have been prejudiced against the State because the State chose to excuse her in open court. *Cf. People v. Coleman*, 307 Ill. App. 3d 930, 936 (1999) (law generally does not allow a person to take advantage of his own wrong).

¶ 25    It is clear that the State made a mistake in its questioning of Barnett. The State could have questioned Barnett in a way that would have elicited whether she was affiliated with any particular religious group, but it did not. The State also compounded its mistake by immediately excusing Barnett from the jury pool before discussing the matter with the trial court in chambers. However, *Batson* does not require that the State be perfect in its conducting of *voir dire*. Rather, *Batson* requires that the trial court assess whether any mistake that the State made was accidental or was intentionally committed to mask a discriminatory motive. *Martinez*, 297 Ill. App. 3d at 339. Such a determination necessarily requires that the trial court assess the prosecutor's credibility. *Id.* Here, the trial court implicitly found that the prosecutor's mistakes were accidental and thus not a *Batson* violation. We cannot say that the trial court's determination was clearly erroneous.

¶ 26    We also reject the defendant's argument that the State's treatment of Barnett was clearly pretextual in light of the way it questioned a white prospective juror on the level of her religious involvement. Although that juror, LaChance, testified that she was active in her church and did missionary work, the State made no inquiry as to her church's denominations or affiliations. Since the State claimed that it was vitally important that it ask Barnett about

her religious affiliations, but it did not even attempt to question LaChance about such things, the defendant insists that the State's reason for rejecting Barnett was pretextual.

¶ 27    In rejecting a similar argument, our supreme court stated:

"The State's purposeful discrimination is not automatically established by the mere coincidence that an excluded juror shared a characteristic with a juror who was not challenged. The excluded juror may possess an additional trait that caused the State to find him unacceptable, while the juror who was not challenged may possess an additional characteristic that prompted the State to find him acceptable to serve as a juror. [Citation.] 'A peremptory challenge is based on a combination of traits, and a juror possessing an unfavorable trait may be accepted while another juror possessing that same negative trait, but also possessing other negative traits, may be challenged.' [Citation.]" *People v. Wiley*, 165 Ill. 2d 259, 282-83 (1995).

¶ 28    Here, the State argues that the difference in its questioning of Barnett and LaChance was that it was able to ask LaChance all the questions that it wanted to, while the trial court curtailed its questioning of Barnett. As noted above, the State erred in determining that the trial court's sustaining of an objection pertaining to Barnett's church prevented it from asking Barnett about her religious affiliations. However, the trial court essentially found that the State made an innocent mistake when it determined that it could not ask Barnett any further related questions. Thus, the trial court could determine that the State's basis for exercising a peremptory challenge against Barnett was not an improper pretext. This is all that *Batson* requires. *Batson* does not mandate that every potential juror be questioned identically. *Wiley*, 165 Ill. 2d at 282-83.

¶ 29    We also reject the defendant's argument that the trial court improperly advocated on behalf of the State in determining whether the State had committed a *Batson* violation. The defendant points out that the trial court explained to the parties that the State was excusing Barnett because she was deeply religious and could not be fair "because of those religious issues." The defendant complains that the State never actually made that argument. The defendant therefore insists that the trial court, by advancing an argument that the prosecution never made, abandoned its role as a neutral arbiter and deprived him of a fair trial. See *People v. Jackson*, 409 Ill. App. 3d 631, 647 (2011) (trial court abuses its discretion when it adopts the role of advocate for one of the parties).

¶ 30    We believe that the defendant's argument misstates the record. In explaining why it was exercising a peremptory challenge against Barnett, the State explained:

"For the record, our concerns were not of her race anyway whatsoever. It was with regards to her religious convictions, which, quite frankly, we were not allowed to go into. And we did not want to risk what some of those religious convictions might lead her to do in this particular situation."

The State additionally stated:

"We wanted to inquire of her regarding her faith, her affiliation with other churches. We do know that some individuals have certain religious convictions that have to be fleshed out to determine whether or not they will in fact, deliberate and be able to sign a guilty verdict. And that was the line of questioning that we were prohibited from going into. Therefore, not knowing what her answers would be, we exercised a peremptory challenge to this juror."

The State later expounded:

> "Judge, there were things that [Barnett] said. She said several things. She said in my spare time I like to read the Bible. She said a lot of things that \*\*\* we weren't able to go further. Her husband is a minister. She's very involved in the church. That certainly gave us reason to go into that area."

¶ 31    The State's comments demonstrate that, because it believed that it could not fully delve into Barnett's religious convictions, it was concerned that those convictions would prevent her from being a fair and impartial juror. The trial court's characterization of the State's objection to Barnett as being based on "religious issues" was therefore accurate. As the trial court's comments reflect arguments actually made by the State, the trial court's comments do not indicate that it was in any way advocating for the State.

¶ 32    We next address the defendant's argument that he was deprived of his right to self-representation. Specifically, the defendant argues that the trial court improperly admonished him that if he waived his right to counsel he would not be able to request the reappointment of counsel during trial. The defendant contends that the trial court's improper admonishment intimidated him into forgoing his constitutional right to represent himself, and thus he is entitled to a new trial.

¶ 33    A defendant has a constitutional right to represent himself. *Faretta v. California*, 422 U.S. 806, 813-14 (1975); *People v. Burton*, 184 Ill. 2d 1, 21 (1998). In order to represent himself, a defendant must knowingly and intelligently relinquish his right to counsel. *Faretta*, 422 U.S. at 835; *Burton*, 184 Ill. 2d at 21. It is "well settled" that a waiver of counsel must be clear and unequivocal, not ambiguous. *People v. Baez*, 241 Ill. 2d 44, 116 (2011). A defendant waives his right to self-representation unless he articulately and unmistakably demands to proceed *pro se. Id.* The purposes of requiring that a defendant make an unequivocal request to waive counsel are to: "(1) prevent the defendant from appealing the denial of his right to self-representation or the denial of his right to counsel, and (2) prevent the defendant from manipulating or abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se.*" *People v. Mayo*, 198 Ill. 2d 530, 538 (2002).

¶ 34    In determining whether a defendant's statement is clear and unequivocal, a court must determine whether the defendant truly desires to represent himself and has definitively invoked his right of self-representation. *Burton*, 184 Ill. 2d at 22. Courts must "indulge in every reasonable presumption against waiver" of the right to counsel. *Brewer v. Williams*, 430 U.S. 387, 404 (1977); *Burton*, 184 Ill. 2d at 23. The determination of whether there has been a knowing and intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances of that case, including the background, experience, and conduct of the accused. *People v. Lego*, 168 Ill. 2d 561, 565 (1995). We review a trial court's determination for an abuse of discretion. *Baez*, 241 Ill. 2d at 116.

¶ 35    Although a court may consider a defendant's decision to represent himself unwise, if his decision is freely, knowingly, and intelligently made, it must be accepted. *Id.* However, "[a]lthough a defendant need not possess the skill and experience of a lawyer in order to choose self-representation competently and intelligently, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." (Internal quotation marks omitted.) *Lego*, 168 Ill. 2d at 564 (quoting *Faretta*, 422 U.S. at 835, quoting *Adams v. United*

- 8 -

*States ex rel. McCann*, 317 U.S. 269, 279 (1942)). The requirement of a knowing and intelligent choice calls for nothing less than a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Baez*, 241 Ill. 2d at 117. Even if a defendant gives some indication that he wants to proceed *pro se*, he may later acquiesce in representation by counsel. *Id.*

¶ 36    Once a defendant is granted the right to proceed *pro se*, he does not have an unequivocal right to revoke his *pro se* status. See *People v. Pratt*, 391 Ill. App. 3d 45, 56-57 (2009). Rather, this is a matter resting in the trial court's discretion. *Id.* at 57. Particularly, the trial court is not obligated to allow the defendant to revoke his *pro se* status if it believes that the defendant is trying to do so to delay the trial proceedings. *Id.*

¶ 37    We do not believe that the trial court improperly admonished the defendant that, if he waived his right to counsel, he would not be able to have counsel reappointed in the middle of trial. The trial court's admonishment essentially informed the defendant that, if he opted to proceed *pro se*, the trial court would not allow him to switch during the trial and be represented by an attorney and thereby delay the trial proceedings. Such a warning was not improper. See *id*.

¶ 38    Moreover, even if the trial court's admonishment was improper, we do not believe that it intimidated the defendant into forgoing his right to self-representation. On April 2, 2012, defense counsel informed the trial court that, while he was standing there reporting on preliminary matters, the defendant had stated that he wished to proceed *pro se*. The following colloquy then occurred between the trial court and the defendant:

"THE COURT: Is this something that just came up in your mind, and do you think you need more time to talk with [your attorneys] regarding your representation of yourself?

THE DEFENDANT: You're a wise man. What would you suggest, Your Honor?

THE COURT: I can't suggest anything, Omarrian. You have to make that decision. You have a right under the United States Constitution and the Illinois Constitution to represent yourself if you wish. If after asking you a number of questions and after going over the nature of the charges and the possible penalties and what's involved here, if you wish and I enter a finding that you knowingly and intelligently waive a right to an attorney, and I believe you have an educational background and the knowledge to proceed on your own behalf, I would allow you to represent yourself. This is serious. You're looking at natural life. Do you understand that?

THE DEFENDANT: Your Honor, yes.

THE COURT: Do you think you need a short period of time to speak [with your attorneys] to see if you can get this issue resolved before you ask this Court for me to order that you can represent yourself? Because once I order if I do find that you're competent to represent yourself and that you knowingly and intelligently have waived your right to an attorney, then at that point there–

THE DEFENDANT: I may do that?

THE COURT: –we're going to proceed to trial and you won't be able to go back in the middle of trial and ask for a lawyer. Do you understand that?

THE DEFENDANT: I understand your stipulation."

- 9 -

¶ 39 Thereafter, the trial court continued the proceeding to allow the defendant to confer with his attorneys as to whether to proceed *pro se*. On the following day, the defendant informed the trial court that he did not wish to proceed *pro se*.

¶ 40 The above portion of the record demonstrates that the defendant did not express a clear and unequivocal desire to proceed *pro se*. Rather, the record indicates that the defendant had only recently considered proceeding *pro se* and had not even discussed the matter with his counsel. The trial court therefore properly allowed the defendant additional time to confer with his attorneys. *Cf. People v. Johnson*, 262 Ill. App. 3d 781, 795 (1994) (trial court did not improperly persuade witness not to testify where he gave witness additional time to decide whether to testify as well as to consult with counsel). As such, the record does not support the defendant's contention that the trial court intimidated him into forgoing his right to represent himself.

¶ 41 The defendant's final contention on appeal is that, under one-act, one-crime principles, this court should vacate all but two of his convictions of murder, all but one of his convictions of home invasion, and his conviction of residential burglary. The State confesses error on this point.

¶ 42 We agree that the trial court erred when it convicted and sentenced the defendant for 12 counts of first-degree murder. Because two individuals were murdered, the defendant can be convicted of only two murders. *People v. McLaurin*, 184 Ill. 2d 58, 104 (1998). We therefore vacate all of the defendant's murder convictions except count XVII (intentional murder of Reynato) and count XIX (intentional murder of Leticia). Further, because the counts of home invasion were all based on the defendant's single entry into the Cardinos' home, only one conviction of home invasion can stand. *People v. Cole*, 172 Ill. 2d 85, 102 (1996). We therefore vacate all of the defendant's convictions of home invasion except for count LIII. Finally, because the defendant's convictions of residential burglary and home invasion were based on the same conduct, we must vacate the conviction of residential burglary. *McLaurin*, 184 Ill. 2d at 106.

¶ 43                                    CONCLUSION

¶ 44 For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed in part and vacated in part.

¶ 45 Affirmed in part and vacated in part.