# Illinois Official Reports

## Appellate Court

---

### *People v. King*, 2017 IL App (1st) 142297

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAVONA KING, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-2297 |
| Filed<br>Rehearing denied | May 12, 2017<br>June 19, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-5344; the Hon. Gregory Robert Ginex, Judge, presiding. |
| Judgment | Affirmed in part; vacated in part. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Ann B. McLennan, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Leslie Billings, and Ashley Behncke, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Lampkin and Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a bench trial, defendant Lavona King was found guilty of home invasion, residential burglary, aggravated battery, and aggravated unlawful restraint. She was sentenced to eight years in the Illinois Department of Corrections for home invasion, five years for residential burglary, three years for aggravated battery, and two years for aggravated unlawful restraint. All sentences were to be served concurrently. On appeal, defendant contends that the trial court failed to conduct an inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), into her claims that trial counsel "ignored" one witness and failed to impeach another. Defendant further contends that certain convictions must be vacated pursuant to the one-act, one-crime rule. We affirm in part and vacate in part.

¶ 2    Following a February 19, 2012, incident, defendant was charged with, *inter alia*, home invasion and residential burglary. Specifically, defendant was charged with home invasion in that she:

> "not being a police officer acting in the line of duty, without authority, knowingly entered the dwelling place of another, to wit: Sage O'Harrow, and she remained in such dwelling place until she knew or had reason to know that one or more persons were present, and while armed with a dangerous weapon, to wit: a bludgeon, she used force or threatened the imminent use of force upon Sage O'Harrow, within such dwelling place, whether or not injury occurred."

Defendant was also charged with residential burglary in that she "knowingly and without authority, entered the dwelling place of Sage O'Harrow, located at 421 North Oak Park Avenue *** with the intent to commit therein a felony, to wit: kidnapping."

¶ 3    At trial, Oak Park police officer Michael Kelly testified that on the morning of January 23, 2012, he responded to a "custody dispute call" at 421 North Oak Park Avenue. When he arrived, defendant was "nervous and upset" about her children who were "staying" at that address. He then spoke to defendant's sister, Sage O'Harrow, and mother, Robin O'Harrow, and learned that defendant had a visitation scheduled with her children at 5 p.m. Kelly further learned that the visit could still take place if defendant left. Although defendant left, Kelly was called back to the location less than an hour later. Defendant was then removed from the location.

¶ 4    Maya King, defendant's daughter, testified that in February 2012, she was 13 years old and lived with her grandmother Robin O'Harrow, her aunt Sage O'Harrow, and her 5-year-old brother Solomon. Maya lived with Robin because defendant "was not able to take care of [her] at the time." They lived on the first floor of a two-flat, and Sage had an apartment in the basement.

¶ 5    On the morning of February 18, 2012, Maya heard "like a glass breaking noise." She thought it was construction noise and went back to sleep. A few minutes later defendant walked in and said, "I am taking you and we have to go look for Solomon." Maya first said no but then left the bed and followed defendant. She observed defendant proceed toward Sage's basement "apartment area." Maya then heard "a lot of yelling and ruckus." Specifically, she heard defendant say that defendant was going to murder Sage. Maya grabbed an iron skillet. She then "thought better of it," put the skillet down, and called her grandmother and the police. She waited in her room until the police arrived and then let officers inside. At this point, she

observed defendant and Sage on the stairs and heard Sage calling for help. Sage was sitting on top of defendant. Defendant was facedown and was holding a wrench. Defendant was taken into custody by police officers. Maya was scared because defendant was not scheduled to be at the house.

¶ 6 Sage O'Harrow, defendant's sister, testified that when she woke up defendant was standing over her with a "black and silver wrench." Sage told defendant that she should not "be here." When defendant asked where Solomon was, Sage replied that he was not there. Defendant then "started swinging the wrench" at Sage and hit her in the head, hand, elbow, and arm. Defendant also pulled Sage's hair. As they struggled, defendant said she was going to kill Sage. At one point, Sage pulled defendant onto the stairs and defendant fell. Sage got on top of defendant and "started screaming" to Maya to call the police.

¶ 7 Robin O'Harrow, defendant's mother, testified that the Department of Children and Family Services (DCFS) placed Maya and Solomon with her in January 2012. Defendant was to have supervised visitation at a DCFS office. Defendant did not have a key to Robin's home and was told that she was not allowed inside. In January 2012, defendant came to the home. The police were called, and defendant was told to leave. Defendant did not have permission to enter the home on February 18, 2012. When Robin left that morning, the doors to the house were locked. When she later returned, she noticed that the glass in her bedroom door was broken.

¶ 8 Oak Park police officer Holly Smith testified that she arrived at 421 North Oak Park Avenue and proceeded to the basement stairs. There, she observed Sage on top of defendant. Defendant was holding a wrench. Smith told defendant 10-12 times to let go of the wrench. Ultimately, defendant was taken into custody.

¶ 9 Defendant testified that she went to visit her children at her mother's house. She had a key to the house. She became worried when no one answered the door. Defendant then walked to her mother's restaurant to ask about her mother. Defendant thought her mother was missing because her mother was not answering the phone. She went back to her mother's house and walked inside through the unlocked back door. Defendant found Maya, who was asleep, and awakened her to get dressed. Defendant asked Maya where everyone was, and after learning that Sage was downstairs sleeping, defendant went to talk to Sage. Defendant opened the door to the basement and called out to Sage. Defendant denied holding a wrench. Sage "like shot up" and asked what defendant was "doing here." Sage then left the bed and began screaming at and pushing defendant. As they approached the stairs, Sage picked up a wrench. Defendant tripped on the stairs and Sage "fell on top" of her. Defendant never had control of the wrench and did not bring it with her. She went to the house because she was supposed to have a visit with her children. Although the wrench belonged to her, she had left it at her mother's house.

¶ 10 The trial court found defendant guilty of home invasion, residential burglary, aggravated domestic battery, and aggravated unlawful restraint. At sentencing, the following exchange took place:

"THE DEFENDANT: There was no evidence to support my end of this deal. I don't understand why this happened at all. My sister took my dog, broke into my house. She took my dog.

THE COURT: [Defendant], I will caution you. You already testified.

THE DEFENDANT: There was one call. I mean I have a witness.

THE COURT: I considered your testimony.

THE DEFENDANT: A witness wasn't called.

THE COURT: If you have any questions—

THE DEFENDANT: This is ridiculous.

\* \* \*

THE DEFENDANT: I don't understand this at all. She is—she has a background.

THE COURT: Very well.

THE DEFENDANT: She is on medication."

¶ 11    The parties then made arguments in aggravation and mitigation. When the trial court asked defendant if there was anything she wished to tell the court, defendant responded:

"I don't know what else to say. These are my kids. It was like domestic insanity going on. I have like a little 13 year old that wanted to run around with my 21-year old sister.

I asked her to pull her medical background, her criminal background. She has heroin possession charges.

I didn't want her in the house with my sister. We were fighting like a month straight. She robbed my house. She took my dog. She has my daughter turned against me."

¶ 12    Ultimately, the trial court sentenced defendant to eight years in prison for home invasion, five years for residential burglary, three years for aggravated battery and two years for aggravated unlawful restraint. All sentences were to be served concurrently.

¶ 13    On appeal, defendant first contends that the trial court failed to conduct a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), into her claims that she was denied the effective assistance of counsel by counsel's failure to call a witness and to impeach Sage with a prior conviction and her use of medication and heroin. The State responds that no *Krankel* inquiry was necessary because defendant's claims were ambiguous and pertained only to matters of trial strategy.

¶ 14    Our supreme court, beginning with *Krankel*, has instructed that when a defendant presents a *pro se* posttrial claim of ineffectiveness of counsel, the trial court should conduct an inquiry to examine the factual basis of the claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). If a defendant's *pro se* allegations of ineffective assistance of counsel show possible neglect, new counsel is appointed to represent the defendant in a full hearing on her claims. *Id.* at 78.

¶ 15    If a defendant does not make a valid ineffective assistance claim, she does not trigger the need for the trial court to inquire. *People v. Taylor*, 237 Ill. 2d 68, 75-77 (2010). Although the pleading requirements for raising a *pro se* claim of ineffectiveness of counsel are "somewhat relaxed," a defendant must still satisfy minimum requirements to trigger a *Krankel* inquiry by the trial court. *People v. Washington*, 2015 IL App (1st) 131023, ¶ 11. "Mere awareness by a trial court that defendant has complained of counsel's representation imposes no duty on the trial court to *sua sponte* investigate defendant's complaint [citation]; however, when defendant presents a *pro se* claim of ineffective assistance, the trial court should first examine the factual basis of defendant's claim [citation]." *Id.* Whether the trial court properly conducted a *Krankel* inquiry presents a legal question and is subject to *de novo* review. *People v. Jolly*, 2014 IL 117142, ¶ 28.

¶ 16    Recently, in *People v. Ayres*, 2017 IL 120071, our supreme court considered whether the defendant's bare allegation of "ineffective assistance of counsel" contained in a posttrial motion to withdraw his guilty plea and vacate his sentence triggered the trial court's duty to conduct a preliminary *Krankel* inquiry, even though that allegation lacked any explanation or supporting facts. The court concluded a defendant's "clear claim asserting ineffective assistance of counsel, either orally or in writing, *** is sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry." *Id.* ¶ 18.

¶ 17    Thus, the question before this court is whether defendant did enough to trigger the trial court's duty to inquire further, that is, did defendant "bring [her] claim to the court's attention." *Id.* ¶ 24. Defendant admits that her "claims were not specifically couched in terms of a formal document claiming ineffective assistance of counsel" but argues that the trial court was still "obligated" to take notice and inquire. However, in the case at bar, defendant's statements fall short of a clear claim of ineffective assistance of counsel that would trigger the trial court's duty to conduct a preliminary *Krankel* inquiry.

¶ 18    Initially, we note, as defendant concedes, that at no point in the proceedings did defendant state, orally or in writing, that counsel was ineffective. With regard to defendant's allegation on appeal that a witness was not presented at trial, the record reveals that during sentencing defendant stated that Sage broke into her house and stole her dog. Defendant further stated that "[t]here was one call" and that she had a "witness." Based upon the record, we cannot determine whether the witness to which defendant referred witnessed the alleged break-in and theft of defendant's dog or the events at issue in this case. Although defendant's statement makes it clear that she is upset with Sage and did not understand "why this happened at all," it is not clear that defendant is complaining about counsel. In other words, defendant failed to make a "clear claim asserting ineffective assistance of counsel, *** sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry." *Id.* ¶ 18.

¶ 19    Defendant also stated, after the trial court asked if she had anything that she wished to tell the court before the court imposed sentence, that:

> "I don't know what else to say. These are my kids. It was like domestic insanity going on. I have like a little 13 year old that wanted to run around with my 21-year old sister.
>
> I asked her to pull her medical background, her criminal background. She has heroin possession charges.
>
> I didn't want her in the house with my sister. We were fighting like a month straight. She robbed my house. She took my dog. She has my daughter turned against me."

¶ 20    Defendant made these statements in allocution, and they can be interpreted to explain defendant's actions, that is, defendant considered Sage to be a bad influence on Maya and blamed Sage for turning Maya against defendant. Although defendant stated that she "asked her," presumably trial counsel, to pull "her," presumably Sage's, medical and criminal background and certainly expressed that she was unhappy with Sage and Sage's influence on her daughter, she did not specifically state that she was unhappy with trial counsel's representation. See *Washington*, 2015 IL App (1st) 131023, ¶ 11 (the trial court's "[m]ere awareness" that the defendant has complained about counsel's representation imposes no duty on the trial court to *sua sponte* investigate her complaint). While defendant may have insinuated that counsel did not investigate Sage to defendant's satisfaction, defendant did not

assert a clear claim that trial counsel was ineffective. Absent defendant asserting a clear claim of ineffective assistance of counsel, the trial court's duty to conduct a *Krankel* inquiry was not triggered. See *Ayres*, 2017 IL 120071, ¶ 18 (a defendant's "clear claim asserting ineffective assistance of counsel, either orally or in writing, *** is sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry").

¶ 21    Defendant next contends that certain convictions must be vacated pursuant to the one-act, one-crime rule. Although defendant did not raise this error before the trial court, arguments relating to the one-act, one-crime doctrine are reviewed under the second prong of the plain-error rule because the potential for a surplus conviction implicates the integrity of the judicial process. *People v. Nunez*, 236 Ill. 2d 488, 493 (2010).

¶ 22    Under the one-act, one-crime rule, multiple convictions may not be based on the same physical act. See *People v. King*, 66 Ill. 2d 551, 566 (1977). Since multiple convictions cannot be based on precisely the same physical act, "a court first determines whether a defendant's conduct consisted of separate acts or a single physical act." *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). An "act" is defined as "any overt or outward manifestation which will support a different offense." *King*, 66 Ill. 2d at 566. The question of whether a defendant's conviction violates the one-act, one-crime rule is subject to *de novo* review. *Nunez*, 236 Ill. 2d at 493.

¶ 23    Defendant first contends that her convictions for home invasion and residential burglary violate the one-act, one-crime rule. She relies on *People v. McLaurin*, 184 Ill. 2d 58 (1998), to argue that her conviction for residential burglary must be vacated because both her home invasion and residential burglary convictions were based upon the same act, that is, her entry into the residence at 421 North Oak Park Avenue.

¶ 24    To determine whether simultaneous convictions violate the one-act, one-crime rule, this court performs a two-step analysis. *People v. Miller*, 238 Ill. 2d 161, 165 (2010). First, we determine whether the defendant's conduct in committing the two offenses consisted of multiple physical acts or a single physical act. *Id.* If it took multiple physical acts to commit the two offenses, both convictions can stand even if the acts were interrelated. *Rodriguez*, 169 Ill. 2d at 188-89. "Multiple convictions are improper," however, "if they are based on precisely the same physical act." *Miller*, 238 Ill. 2d at 165.

¶ 25    If the criminal conduct involved multiple physical acts, we proceed to the second step of the analysis, which is to ask whether one offense is a lesser included offense of the other offense. *Id.* The one-act, one-crime rule forbids simultaneous convictions of the greater offense and the lesser included offense. *Id.* When deciding whether a charged offense is a lesser included offense of another charged offense, we use the abstract-elements approach. *Id.* at 172-73. Under the abstract-elements approach, we compare the statutory elements of the two offenses. *Id.* at 166. If all the elements of one offense are included in the second offense and if the first offense contains no element that the second offense lacks, the first offense is a lesser included offense of the second. *Id.* Pursuant to our *de novo* review (*Nunez*, 236 Ill. 2d at 493), we will apply this two-step analysis to the offenses of home invasion and residential burglary.

¶ 26    First, we must determine whether the conduct by which defendant committed these two offenses consisted of "precisely the same physical act" as opposed to multiple physical acts. See *Miller*, 238 Ill. 2d at 165. To commit home invasion, as that offense is defined in section 19-6(a)(1) of the Criminal Code of 2012 (720 ILCS 5/19-6(a)(1) (West 2012)), defendant had to do the following physical acts: (1) "enter[ ] the dwelling place of another" and (2) "use[ ] force" against someone in the dwelling place. To commit residential burglary, defendant had to

perform only one physical act, that is, enter a dwelling place. See 720 ILCS 5/19-3(a) (West 2012).

¶ 27    Accordingly, the conduct comprising home invasion and residential burglary does not consist of precisely the same physical act; rather, the conduct consists of multiple physical acts, *i.e.*, entering the dwelling place and using force against someone inside. See *Rodriguez*, 169 Ill. 2d at 188-89. Therefore, the first step of the *Miller* analysis does not prevent simultaneous convictions for home invasion and residential burglary. See *Miller*, 238 Ill. 2d at 165.

¶ 28    The second step of the analysis asks whether residential burglary is a lesser included offense of home invasion. *Id.* A comparison of statutory elements of the two offenses reveals that the lesser offense of residential burglary has an element that the greater offense of home invasion does not, specifically, having, at the moment of the unauthorized entry or the moment of the unauthorized remaining, an "intent to commit therein a felony or theft." 720 ILCS 5/19-3(a) (West 2012). Section 19-3(a) provides: "A person commits residential burglary when he or she knowingly and without authority enters or knowingly and without authority remains within the dwelling place of another, or any part thereof, with the intent to commit therein a felony or theft." 720 ILCS 5/19-3(a) (West 2012).

¶ 29    The statute defining home invasion, on the other hand, does not mention entering or remaining in a dwelling place with the intent to commit a felony or theft. Rather, section 19-6(a)(1) provides that:

> "(a) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present *** and

> > (1) While armed with a dangerous weapon, other than a firearm, uses force or threatens the imminent use of force upon any person or persons within such dwelling place whether or not injury occurs ***." 720 ILCS 5/19-6(a)(1) (West 2012).

¶ 30    Home invasion, in contrast to residential burglary, does not require that the defendant enter the dwelling place with the specific intent to commit a felony or theft inside the dwelling place. The only mental state that home invasion requires at the moment of entry is knowledge: *i.e.*, the defendant knows that she is entering the dwelling place, and she knows or has reason to know that someone is present in the dwelling place. Residential burglary is not therefore a lesser included offense of home invasion, because residential burglary has an element that home invasion lacks, namely, entering the residence or remaining in the residence with the intent to commit a felony or theft therein. See *Miller*, 238 Ill. 2d at 166.

¶ 31    Accordingly, the simultaneous convictions of home invasion and residential burglary do not violate the one-act, one-crime rule because (1) the criminal conduct that was the basis of those offenses consisted of multiple physical acts instead of precisely the same physical act; and (2) under the abstract-elements approach, residential burglary is not a lesser included offense of home invasion. See *id.* at 165.

¶ 32    In so holding, we acknowledge that in *People v. McLaurin*, 184 Ill. 2d 58, 106 (1998), our supreme court concluded that the offenses of home invasion and residential burglary were "carved from the same physical act of [the] defendant's entering the dwelling [place]" and that

the residential burglary conviction therefore had to be vacated. However, because the *McLaurin* court did not specifically address the fact that the offense of home invasion requires the additional physical act of causing injury to a person in a dwelling, we do not interpret *McLaurin* as foreclosing a determination that home invasion consists of multiple physical acts. We also note that panels of this court have similarly distinguished *McLaurin*. See *People v. Lee*, 2012 IL App (1st) 101851, ¶ 54 (holding residential burglary and home invasion require the State to prove different elements for each crime and, thus, do not violate the one-act, one-crime rule). See also *People v. Price*, 2011 IL App (4th) 100311, ¶¶ 27-30 (distinguishing *McLaurin* because the court failed to address (1) its earlier decision in *Rodriguez* finding that where multiple acts are present their interrelationship does not preclude multiple convictions, (2) that the offense of home invasion required an additional element, *i.e.*, the physical act of intentionally causing injury to a person in the dwelling, and (3) that its determination regarding home invasion and residential burglary was inconsistent with its earlier holding in the same case regarding the offenses of intentional murder and home invasion). But see, *e.g.*, *People v. Jones*, 2015 IL App (2d) 120717, ¶ 42 (following *McLaurin*); *People v. Johnson*, 347 Ill. App. 3d 570, 577 (2004) (following *McLaurin*).

¶ 33    We finally note that *McLaurin* did not expressly overrule those prior cases that held residential burglary and home invasion were not carved from the same physical act. See *People v. Lobdell*, 121 Ill. App. 3d 248, 252 (1983) ("Since entry into the victim's home was only part of the home invasion offense and the sole act of the residential burglary offense, the two offenses were not carved from the same physical act."); *People v. Jones*, 148 Ill. App. 3d 133, 145 (1986) (following *Lobdell*); *People v. Govednik*, 150 Ill. App. 3d 717, 723-24 (1986) (following *Lobdell*). Defendant's argument must therefore fail.

¶ 34    Defendant finally contends that her convictions for aggravated battery and aggravated unlawful restraint violate the one-act, one-crime rule because they are based upon the same physical act. The State concedes that defendant's conviction for aggravated unlawful restraint must be vacated pursuant to the one-act, one-crime rule because defendant's action of unlawfully restraining Sage was inherent in the aggravated battery. We therefore vacate defendant's conviction for aggravated unlawful restraint.

¶ 35    For the reasons stated above, we vacate defendant's conviction for aggravated unlawful restraint. We affirm the judgment of the circuit court of Cook County in all other aspects.

¶ 36    Affirmed in part; vacated in part.