2025 IL App (1st) 231820-U

THIRD DIVISION
December 31, 2025

No. 1-23-1820

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 14 CR 16765 |
| | ) | |
| PETER WILLIAMS, | ) | Honorable |
| | ) | Patrick K. Coughlin, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Martin and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1   *Held*:  Affirming the judgment of the circuit court of Cook County where (a) the trial court did not err in granting the defendant's request to proceed *pro se* and denying his subsequent requests for standby counsel and for the reappointment of a public defender; (b) the evidence was sufficient to sustain his conviction for attempted first-degree murder; and (c) the trial court's admonishments regarding trial *in absentia* substantially complied with statutory requirements.

¶ 2   Defendant Peter Williams was charged in a 219-count indictment with invading a residence with codefendant David Jordan[1] in August 2014 to rob the homeowner at gunpoint and

---

[1] Defendant has represented that Jordan pleaded guilty to home invasion in 2023 and was sentenced to a 40-year prison term. Jordan is not a party to this appeal.

then holding multiple women and children captive in a 20-hour standoff with police, during which defendant shot police officer Darnell Keel (Officer Keel) and sexually assaulted one of the women, A.J.[2] Following a jury trial in the circuit court of Cook County, defendant was found guilty of attempted first degree murder, home invasion, aggravated battery, aggravated criminal sexual assault, aggravated discharge of a firearm, and aggravated criminal sexual abuse. Defendant was sentenced to a 195-year term in the Illinois Department of Corrections (IDOC).

¶ 3    In this direct appeal, defendant raises three primary arguments relating to his self-representation in the trial court proceedings, *i.e.*, defendant contends that the trial court erred in (a) accepting his waiver of counsel approximately two years before trial; (b) denying his requests for the reappointment of counsel shortly before trial; and (c) denying his request for standby counsel. As to his convictions related to the shooting of Officer Keel, defendant asserts that the State failed to prove beyond a reasonable doubt that he specifically intended to kill Officer Keel or that he knew or should have known that Officer Keel was a police officer. Finally, defendant maintains that he should be granted a new trial, as he was tried *in absentia* but was never admonished that he would waive the opportunity to confront witnesses if he did not attend his trial. For the reasons discussed below, we affirm the judgment of the circuit court in its entirety.

¶ 4                           BACKGROUND

¶ 5                    *Initial Waiver of Counsel*

¶ 6    At his arraignment on September 30, 2014,[3] defendant was represented by Assistant Public Defender (APD) Kimberly Malone (Malone) of the Law Office of the Public Defender of Cook County (Public Defender's Office). After defendant stated that he wanted a speedy trial

---

[2] We refer to victims of sex offenses by their initials to protect their privacy. *People v. Munoz-Delgado*, 2016 IL App (2d) 140325, ¶ 1 n.1.

[3] Although the transcript indicates that the arraignment occurred on September 14, 2014, defendant represents (and the record otherwise suggests) that the correct date was September 30, 2014.

and was "ready to go to trial today," the circuit court passed the case to allow Malone and defendant to confer. When the proceedings recommenced, Malone stated that she explained to defendant that she was "not in a position to demand trial" as she had not yet had an opportunity to review the criminal counts and their potential penalties, to review any evidence, or to speak with defendant about his rights or the facts of the case. The circuit court informed defendant that "[a]n attorney makes all tactical and strategic decisions on your behalf" and opined that it would be imprudent to demand trial at that early stage. The case was continued by agreement.

¶ 7   At the next hearing on October 29, 2014, defendant stated that he was firing Malone and wished to proceed *pro se*. Malone was allowed to withdraw, and the circuit court admonished defendant regarding the nature of the charges, the possible penalties, and the risks and consequences of self-representation. Upon questioning by the circuit court, defendant indicated that he was 41 years old, he had completed high school and a "few years in college," and he had been employed in "[c]onstruction, demolition, delivery, sales, all kinds of work." The circuit court found that defendant had satisfactorily waived his right to an attorney and allowed him to proceed *pro se*. At the conclusion of the hearing, defendant demanded trial.

¶ 8   Defendant proceeded *pro se* for the next few weeks, *e.g.*, he participated in hearings and reviewed discovery materials. At a hearing on November 20, 2014, the circuit court denied defendant's request for the assignment of a private investigator to interview witnesses and review police records. Defendant then explained that he was "in segregation" due to his alleged misconduct, which restricted his access to the IDOC law library. He asked for the appointment of an attorney other than an APD, claiming that the Public Defender's Office was "prejudiced" against him. The circuit court denied the request, and defendant continued to represent himself.

¶ 9   During a hearing on November 26, 2014, defendant expressed frustration regarding his

continued lack of access to the law library. When the circuit court indicated that the State's

motion to admit proof of other crimes would be argued at the next hearing, defendant stated,

"I change my mind. I want counsel now." The court allowed defendant to speak privately with a

supervisor from the Public Defender's Office. The supervisor subsequently relayed to the circuit

court that she had explained the role and the responsibilities of her office to defendant.

The Public Defender's Office was reappointed, and APD Malone was reassigned to his case.

¶ 10    Malone represented defendant for years as various pretrial matters were litigated.

At Malone's request, the circuit court ordered a forensic clinical examination of defendant.

Following fitness proceedings in 2019, a jury found that defendant was fit to stand trial or plead.

¶ 11                    *Second Waiver of Counsel and Denial of Standby Counsel*

¶ 12    Defendant refused to appear on camera for remote hearings in early 2021. During a

hearing on April 13, 2021, defendant indicated that he wished to proceed *pro se*, as he did not

want to be represented by the Public Defender's Office. While defendant stated that he respected

Malone "as a person," he was "adamant" that he did not want her to serve as his counsel.

Defendant continued, "My main reason for not wanting to be represented by the Public

Defender's Office is because I asked for a speedy trial in front of Judge Demacopoulos[4] and

Kim Malone said that she wouldn't do it so the Public Defender's Office refused me my

constitutional right to have a speedy trial."

¶ 13    Defendant and Malone were present for an in-person hearing on April 20, 2021. After

explaining the nature of the charges and the potential penalties, the circuit court questioned

defendant regarding his education and work history. Defendant argued that he had previously

represented himself before Malone's reappointment, and he referenced his "extreme conflict"

---

[4] The 2014 proceedings (described above) were before Judge Anna H. Demacopoulos. Judge Patrick K. Coughlin was subsequently assigned to this matter, and he presided over the trial.

with Malone based on his speedy trial concerns.  The circuit court responded: "I am not going to get into the earlier demand for trial.  Counsel needed additional time or wasn't able to answer ready.  That's a separate issue."  The circuit court also explained that defendant was entitled to free representation by the Public Defender's Office or to privately retained counsel, but he was not allowed to choose which APD represented him.

¶ 14    Defendant then stated that he "would appreciate counsel other than the Public Defender to represent me and help me with my defense."  The circuit court asked whether defendant was requesting standby counsel.  Defendant replied, "Something like that, with the exception as long as it has nothing to do with the Public Defender's Office.  I have no problem with that."  The circuit court indicated that it would consider his request.

¶ 15    After admonishing defendant regarding the risks and consequences of self-representation, the circuit court allowed defendant to proceed *pro se*, and the Public Defender's Office requested leave to withdraw.  Malone noted for the record that she could not honor defendant's request to demand trial in 2014, as she would not have been prepared to proceed given the substantial volume of evidence in the case.  The Public Defender's Office was granted leave to withdraw.

¶ 16    During a hearing on September 1, 2021, the circuit court indicated that it had ordered the transcript of the hearing on April 20, 2021, and had noticed potential discrepancies in the transcript.  While the circuit court believed that the correct admonishments were previously given, the circuit court re-admonished defendant, over his objections.  Defendant confirmed that he continued to wish to represent himself.

¶ 17    In the meantime, defendant had filed a written motion for the appointment of standby counsel.  During the hearing on the motion, at the circuit court's request, the State made a proffer of what the evidence was expected to show at trial.  The State also informed the circuit court that

defendant had convictions for vehicular hijacking, unlawful use of a weapon by a felon, and concealing a homicide. In denying defendant's motion for standby counsel, the circuit court observed that defendant had "some experience" with the criminal court system and that the "majority of the evidence is going to come in the form of eyewitness accounts" (*i.e.*, not in the form of complicated scientific testimony which could necessitate attorney representation).

¶ 18    The circuit court offered, however, to appoint counsel to assist in subpoenaing witnesses, if needed. The defendant responded, "As long as it's not a public defender," and he maintained that he was "denied [his] speedy trial rights" on April 20, 2021. Defendant expressed distrust of the Public Defender's Office, observing that "[t]he same people who paid the public defender also pays the prosecution." After explaining that the APD would have provided ineffective assistance if she answered ready for trial but was not ready, the circuit court again denied the request for standby counsel.

¶ 19    Defendant subsequently indicated that he trusted one APD: Kulmeet Galhotra (Galhotra). Noting that the supervisors at the Public Defender's Office determine attorney assignments, the circuit court denied defendant's request for a specific APD. At the next hearing on October 14, 2021, the circuit court stated that Malone had been transferred to a different unit, and the State relayed that Galhotra had retired. Defendant stated that he would continue representing himself.

¶ 20    On May 20, 2022, the circuit court held a hearing on the State's motion to admit certain out-of-court statements from the victim sensitive interviews of two of the minor children who were in the residence during the police standoff (see 725 ILCS 5/115-10 (West 2022)). After initially participating in the hearing, defendant reiterated his request "for counsel other than a public defender to help assist me with my defense." The circuit court reminded defendant that his request for standby counsel was previously denied and that he had chosen to represent

himself. Defendant subsequently informed the court that he did not want to participate in the hearing on the motion and wished to immediately leave the courtroom, which the court allowed. After hearing testimony, the circuit court asked for defendant to be returned to the courtroom and then summarized the testimony for him, over his objection. When the circuit court asked if defendant had any questions for the witness, defendant used offensive language and the circuit court held him in direct criminal contempt. At the conclusion of the hearing, defendant complained that he was being "railroad[ed]" and that his due process rights were being violated. The circuit court subsequently granted the State's motion to admit the out-of-court statements.

¶ 21                                  *Request Shortly Before Trial*

¶ 22      Defendant continued to represent himself, *e.g.*, he filed a motion to dismiss on speedy trial grounds, which the circuit court denied. A trial date of March 7, 2023, was eventually set. During a hearing on February 27, 2023, defendant indicated that he was "objecting to jury selection" and was "not possibly ready for trial." After the circuit court informed him that the scheduled trial would go forward, defendant reiterated his request for legal assistance. The circuit court denied this request, opining that defendant was attempting to "manipulate the system" with "dilatory tactics." Following a contentious exchange, defendant stated, "Well, I need a public defender, then. I want it on the record today that I'm asking for a public defender." Defendant subsequently left the courtroom after saying "f*** you" to the circuit court. The circuit court then noted for the record: "This is a case which is from 2014. The defendant has had a public defender, fired the public defender, got reappointed the public defender, and fired the public defender. It's obvious to this Court that he does not want to go to trial, that he'd rather just continue to remain in Cook County rather than go to trial on this case. These are complete [*sic*] dilatory tactics. The case is going forward to jury trial on March 7th."

¶ 23                                            *Trial*

¶ 24    On March 7, 2023, defendant stated that he wished to be represented by counsel. The trial court responded, in part, "You have chosen to represent yourself." The trial court then informed defendant that he had the right to attend his trial; he had the right to waive the right to be physically present; if he chose not to be present, then the trial would proceed *in absentia*, as if he had escaped or fled; the State still had the same burden of proof as it would if he were present; and the jury instructions would be the same as if he were present. Defendant indicated that he did not want to attend the trial and did not want to represent himself. He referred to his "conflict" with APD Malone and told the court, "I just know you got to bring me some type of other Public Defender but not her." The trial court denied his request.

¶ 25    Defendant was permitted to leave the courtroom and was placed in a holding room where he could view the proceedings via Zoom teleconference. He tore a poster from the wall and used it to cover the computer screen; he then pounded on the window and kicked the door, repeating his desire to return to jail. Defendant subsequently refused to attend the proceedings on multiple occasions.

¶ 26    The testimony and other evidence presented at trial included the following.

¶ 27                                        Derrick Morris

¶ 28    Derrick Morris (Morris) testified that he drove to the residence of his friend Charles Israel (Israel) in Harvey, Illinois, in the late morning hours of August 19, 2014, for Israel's father to perform mechanical work on his vehicle. Morris entered the house, observed "a lot" of family members, and conversed with Israel in the kitchen. Israel's sister then indicated "somebody is at the door" who wanted to perform yard work. According to Morris, a man entered the house while pointing a handgun, and he directed the occupants to "get down." Morris viewed only one

individual, but he could hear a second individual.

¶ 29    Morris testified that the man "stomped" on Israel and Morris, resulting in injuries to Morris's face and lips. The man also placed a knife to Morris's ear and took his shoes and jewelry. After escorting Israel to the second floor of the house to "get his money" and "whatever valuables he had," the man walked with Israel down the stairs toward the basement. At that point, an individual who identified himself as "the police" knocked on the back door of the residence, and Israel answered. The man shot at a police officer, who returned fire.

¶ 30    When the shooting stopped, the man demanded that someone close the door. Morris ran to the door, jumped off the porch, and ran to the alley. He noticed Officer Keel from the Harvey Police Department (who he previously knew) and other officers outside of the residence.

¶ 31                                    Officer Darnell Keel

¶ 32    Officer Keel testified that he heard a radio dispatch relating to a 911 call while driving at noon on August 19, 2014. Officer Keel arrived at a residence near 147th Street and Seeley Avenue, exited from his vehicle with another officer, and knocked on the front door of the house, but no one answered. After speaking to an individual performing work on a vehicle behind the house, Officer Keel knocked on the back door of the house. Officer Keel testified that a man answered the door, and Officer Keel stated, "did anybody here call the police." The man answered "no" and closed the door. A second later, the same man flung the door open and dove off the back porch. When Officer Keel looked through the open door, he observed flashes of gunfire but did not observe the shooter. Officer Keel was shot in his arm, and he returned fire.

¶ 33    Officer Keel then jumped off the porch and continued shooting into the house. A second man ran out of the house and dove off the porch. Additional officers and medical personnel arrived, and Officer Keel was transported to Christ Hospital, where his arm was surgically

repaired, and he was hospitalized for one week. Officer Keel was required to wear a cast and a sling for four or five months, and he returned to active duty one year after the shooting.

¶ 34                                    Detective Andrew Wallace

¶ 35    Detective Andrew Wallace (Wallace) of the Harvey Police Department testified that he was driving in an unmarked vehicle at around noon on August 19, 2014, when he heard a radio dispatch for a 911 hang-up call. While at a stop sign listening to the radio traffic, a woman ran to his vehicle and yelled that "somebody had her babies" in a nearby house. Wallace pulled up to the house and exited his vehicle; he observed an officer taking cover by the side of the house. Officer Keel, who was at the back of the house, screamed that he had been shot.

¶ 36    Wallace crouched behind a vehicle parked in front of the house. A man who was holding a woman at gunpoint then appeared at the front door. According to Wallace, the man used the woman as a shield. Wallace pointed his firearm at the man, identified himself as a police officer, and ordered the man to "let go" of the woman. The man screamed and began shooting at Wallace, who dove to the ground. The man and woman returned inside the house. When SWAT (Special Weapons and Tactics) team members arrived, they used ballistic shields to move Wallace to safety. He identified defendant as the shooter in a photo array the following day.

¶ 37                                    Officer Gregory Thomas

¶ 38    Officer Gregory Thomas (Thomas) of the Harvey Police Department testified that he received a dispatch of "shots fired with an officer down" at approximately 12:30 p.m. on August 19, 2014. Thomas drove to a residence on South Seeley, where he noticed his colleague Wallace standing in the street. Thomas then observed a man and woman exit from the house. The man stood behind the woman, and he held his arms across her shoulders and chest as he fired a handgun at Wallace. Thomas identified the shooter as defendant. Thomas retrieved his

patrol rifle from his vehicle and yelled "police" at defendant to attempt to distract him from Wallace. The man looked at Thomas and then dragged the woman back into the house. Thomas eventually spent approximately 21 hours at the scene, until defendant was taken into custody.

¶ 39                                                    A.J.

¶ 40    Israel's sister A.J. testified that she went to his house on August 19, 2014. A.J.'s father and uncle repaired a vehicle in the backyard, while Israel and Morris conversed in the house. Six children were in the house: five relatives and the two-year-old son of a relative's girlfriend. As the two-year-old boy had a feeding tube, his nurse Emence Julian (Julian) was also present.

¶ 41    A.J. heard a knock at the door. When she opened the door, a man—who A.J. identified as defendant—offered to cut the grass. A.J. observed a second man with a lawnmower nearby. At Israel's direction, A.J. relayed that they did not need the grass to be cut at that time, but she requested his business card. When A.J. entered defendant's information into her cellphone, he identified himself as "Animal," which made A.J. "very uncomfortable."

¶ 42    Defendant pulled out a handgun and forced A.J. to open the door. He entered the house and directed the occupants to "get on the floor." The second man (who was previously by the lawnmower) entered the house and stood by the front door with a firearm. Defendant instructed the second man to take Israel upstairs to search for $50,000. When only $5000 was found, defendant hit and poked Israel with a knife, accused him of lying, and threatened to kill him.

¶ 43    Israel's father entered the home and initially thought the scene was a "joke." Defendant swore at him and smacked an earbud out of his ear. Israel subsequently went to the back door and A.J. heard a man who identified himself as "police" at the door. According to A.J., Israel "dove out the back door" and then she heard an exchange of gunfire. When defendant directed Morris and then Israel's father to close the back door, both men fled. The children and the two

11

women, A.J. and Julian, remained in the home with the intruders.

¶ 44    Defendant attempted to exit through the front door with A.J. "strapped" in front of him; his handgun was pointed at her head.  Defendant shot at officers and returned inside the house.  Defendant then directed the women to cover the windows and bring the children to the second floor.  After the men discussed escape ideas, defendant forced A.J. to call the police and repeat his words.  When Julian prayed aloud, defendant claimed to be the devil.

¶ 45    At some point, defendant moved A.J. to another room and forced her at gunpoint to perform oral and vaginal sex.  He then started pouring bleach throughout the second floor of the house to "get rid of DNA," which caused the women and children to feel ill.  He directed A.J. to bring him marijuana.  As defendant smoked the marijuana and drank alcohol, his firearm discharged, which caused the children to scream and cry.

¶ 46    Defendant eventually released some of the children as he continued to force A.J. to call the police to speak with negotiators.  After releasing another child in exchange for cigarettes, he again sexually assaulted A.J. at gunpoint.  Law enforcement officers eventually stormed the house, as defendant began shooting from a closet where he was hiding.  The police successfully removed the women and children, and A.J. was taken to the hospital, where a sexual assault kit was collected.  She later identified defendant in a photo array at the police station.

¶ 47                                Emence Julian

¶ 48    Julian testified that she was working as a pediatric skilled care nurse at a house on South Seeley on August 19, 2014; her patient was a two-year-old boy.  Her testimony was similar to that of A.J., *i.e.*, two men with firearms entered the house, forced the occupants to lay face down on the floor, searched for money upstairs with Israel, and then returned downstairs.  At that point, Julian heard someone state that the police were outside.  After she heard gunfire, one of

the men directed her to stand up and then kicked her in the head when she did not immediately comply. Julian observed the defendant and the other man standing directly in front of her.

¶ 49    The men instructed the women and children to go to the second floor of the house. She recalled defendant's remarks after she had prayed aloud as: "I'm the devil. You're staring at death." She testified that the bleach he spread caused breathing difficulty and discomfort. Julian described how defendant forced A.J. at gunpoint to repeat his words verbatim during many phone calls with police officers. Throughout the night, defendant told the women that he would shoot them if they ran, and he "knew where to shoot us to paralyze us for life." When defendant took A.J. to another room, the other man told Julian that "the situation went way further than it intended on them going." The man explained to Julian that the homeowner had taken "things" and "got them thrown in jail," and they returned "to get what was due." After the hostage situation ended, Julian identified defendant in a photo array as the main aggressor.

¶ 50                                        Other Witnesses

¶ 51    Deputy Chief Richard Velasquez of the Cook County Sheriff's Police Department testified that he was a SWAT team member on August 19, 2014; he was dispatched to a "code red" on South Seeley in Harvey at approximately 1:10 p.m. He testified regarding the SWAT team's actions during the 20-hour standoff. Another SWAT team member, Richard O'Brien, identified defendant and David Jordan as the individuals taken into custody.

¶ 52    Sergeant Cary Morin of the Illinois State Police described tasks he performed as a crime scene investigator on this case, including the administration of a gunshot residue test on defendant and Jordan. Robert Berk, who was previously employed as a forensic scientist for the Illinois State Police, testified that Jordan tested negative for gunshot residue, but defendant's left hand tested positive, which was consistent with defendant having discharged a firearm.

¶ 53                                        *Verdict and Sentencing*

¶ 54    After the State presented its closing argument, the jury deliberated and found defendant

guilty of attempted first degree murder, home invasion, aggravated battery, aggravated criminal

sexual assault, aggravated discharge of a firearm, and aggravated criminal sexual abuse.  At

defendant's request, the Public Defender's Office was appointed for purposes of posttrial

motions and sentencing.

¶ 55    During a hearing on defendant's amended motion for a new trial, counsel argued, in part,

that if APD Malone had been reappointed shortly before trial, there was no indication in the

record that she would not have been ready to proceed to trial, given her years of involvement in

the case.  The trial court rejected this contention, observing that Malone was last assigned on

April 20, 2021, which was nearly two years prior to the trial.  The trial court further noted:

> "This was one of the oldest cases on the Court's call, probably one of the oldest in Cook
>
> County at the time of the trial.  The Court viewed, based on the totality of the
>
> circumstances and the individual facts of this case, the defendant's request for the Public
>
> Defender made only on the day the case was actually going to a jury trial, after having
>
> previously set four times for jury and the defendant saying nothing about wanting counsel
>
> on any of those earlier dates, the defendant having had and then rejected Public Defender
>
> representation on two prior occasions, the defendant's reluctance to move the case
>
> forward on several of those dates over the 21 court dates he appeared before me, the
>
> Court believed defendant was purposely trying to employ dilatory tactics, trying to
>
> prevent the effective administration of justice."

The trial court denied the amended motion for a new trial, and defendant was sentenced to an

aggregate term of 195 years in IDOC.  He subsequently filed this timely appeal.

¶ 56                                    ANALYSIS

¶ 57     Defendant advances multiple arguments on appeal.  First, he raises a series of challenges

relating to his self-representation.  He asserts that the trial court erred by accepting his waiver of

counsel in 2021, by denying his requests for reappointment of the Public Defender's Office

before trial, and by denying his request for standby counsel.  Second, he contends that the State

did not prove beyond a reasonable doubt that he intended to kill Officer Keel or that he knew or

should have known that Officer Keel was a police officer.  Finally, defendant maintains that he

should be granted a new trial since he was not admonished that he waived the opportunity to

confront witnesses when tried *in absentia*.  We address each contention below.

¶ 58                                *Self-Representation*

¶ 59     Defendant contends that the trial court erred in accepting his waiver of counsel in 2021.

He claims that his waiver was not "knowing," as he did not understand his right to appointed

counsel, and that his waiver was equivocal, as he did not indicate an "actual desire" to represent

himself.   Based on this alleged error, defendant maintains he is entitled to a new trial.

¶ 60     As a threshold matter, we observe that defendant forfeited this issue by failing to raise it

in his amended motion for a new trial.  See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)

(discussing "the general rule that the failure to raise an issue in a written motion for a new trial

results in a waiver of that issue on appeal").  The failure to preserve an error results in forfeiture

unless the defendant can establish plain error.  Ill. S. Ct. R. 615(a).  To establish plain error, a

defendant must initially demonstrate that a "clear or obvious" error occurred.  *People v.*

*Piatkowski*, 225 Ill. 2d 551, 565 (2007).  The defendant must then establish that (1) "the evidence

is so closely balanced that the error alone threatened to tip the scales of justice against the

defendant, regardless of the seriousness of the error," or (2) "the error is so serious that it

affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.* See *People v. McNutt*, 2020 IL App (1st) 173030, ¶ 77 (noting that "[a]lthough defendant did not preserve the issue of the effectiveness of his waiver of counsel, we review his claim under the plain-error doctrine, as it raises the question of whether defendant was denied a substantial right").

¶ 61    A defendant has a constitutional right to represent himself. *Faretta v. California*, 422 U.S. 806, 835 (1975). See *McNutt*, 2020 IL App (1st) 173030, ¶ 78 (observing that "[j]ust as a criminal defendant has the right to the assistance of counsel, he also has the right to proceed without counsel under the sixth amendment of the United States Constitution"). To represent himself, a defendant must "knowingly and intelligently" relinquish his right to counsel. *People v. Baez*, 241 Ill. 2d 44, 115-16 (2011). The waiver cannot be ambiguous; it must be clear and unequivocal. *Id.* at 116. The purpose of requiring a defendant to make an unequivocal request to waive counsel is to (1) prevent the defendant from appealing the denial of his right to self-representation or the denial of his right to counsel, and (2) prevent the defendant from abusing or manipulating the system by wavering between his request to proceed *pro se* and his request for counsel. *Id.* After a clear and unequivocal request to proceed *pro se*, the trial court must determine if the waiver of counsel is knowing and voluntary, *i.e.*, the defendant is fully aware of the nature of the right being abandoned and the consequences of the decision to abandon it. *People v. Lego*, 168 Ill. 2d 561, 564 (1995).

¶ 62    We consider the entire record when determining whether a defendant's waiver of counsel was knowing and intelligent. *McNutt*, 2020 IL App (1st) 173030, ¶ 84. The determination of whether there has been a valid waiver of the right to counsel "must depend, in each case, upon the particular facts and circumstances of that case, including the background, experience, and

conduct of the accused." *Baez*, 241 Ill. 2d at 116. We review the trial court's determination for an abuse of discretion. *Id.* "The inquiry, under this most deferential standard, is not whether the reviewing court would have made the same decision if it were acting as the circuit court." *People v. Morgan*, 2025 IL 130626, ¶ 23. Rather, a trial court abuses its discretion when its decision is arbitrary, fanciful or unreasonable to the degree that no reasonable person would agree with the decision. *Id.*

¶ 63    We find that the trial court did not abuse its discretion in accepting defendant's 2021 waiver of counsel. While defendant contends on appeal that APD Malone had doubts regarding defendant's fitness, we note that a jury ultimately determined that he was fit to stand trial. We further note that defendant "was well into adulthood, had completed high school and some postsecondary education, and had a criminal record that suggested at least some experience" with the legal system. See *McNutt*, 2020 IL App (1st) 173030, ¶ 101. Defendant was repeatedly admonished regarding his right to counsel, in accordance with Illinois Supreme Court Rule 401 (eff. July 1, 1984). Furthermore, as defendant was represented by an APD at his arraignment and then again between November 2014 and April 2021, defendant understood the nature of his right to counsel. See, *e.g.*, *People v. Phillips*, 392 Ill. App. 3d 243, 264 (2009) (observing that "since defendant had, until that moment, been represented by appointed counsel, he knew that he had a right both to counsel in general and to appointed counsel due to being indigent"). Defendant unequivocally waived his right to appointed counsel, insisting that he did not want the Public Defender's Office to represent him.

¶ 64    Defendant contends on appeal that the trial court knew when it accepted his waiver that the reason he wanted to proceed *pro se* was his mistaken belief that APD Malone had violated his right to a speedy trial. Even if, however, the trial court considered defendant's reason to be

17

flawed or unwise, the right to waive counsel stems from "that respect for the individual which is the lifeblood of the law." *People v. Kidd*, 178 Ill. 2d 92, 104 (1997). "[E]xisting caselaw clearly holds that a lack of legal sophistication, knowledge, or experience—manifested in the form of unsupported legal theories, unsuccessful strategies, and unwise tactical decisions—is not a basis" on which to find a defendant's waiver of counsel to be ineffective. *McNutt*, 2020 IL App (1st) 173030, ¶ 96. See *People v. Khan*, 2021 IL App (1st) 190679, ¶ 69 (noting that "the fact that defendant had a poor defense to the charges does not mean that defendant failed to understand the nature of the charges against him"). In sum, we find no error where the trial court properly exercised its discretion in accepting defendant's waiver of counsel in 2021 following his refusal to be represented by the Public Defender's Office. See *People v. Harris*, 2013 IL App (1st) 111351, ¶ 81 (providing that "[o]nce the court has assured itself that the waiver is valid, it may not force a defendant to continue to be represented by counsel he does not want").

¶ 65 Defendant next contends that the trial court should not have refused to reappoint the Public Defender's Office without considering whether it would cause a delay. We observe, however, that in its denial of the amended motion for a new trial, the trial court expressly found that defendant's "third" request for counsel shortly before the trial was, in fact, a delay tactic. The trial court further noted that APD Malone had not been assigned to the case for the preceding two years, during which there were numerous hearings and substantive rulings.

¶ 66 A defendant who has waived his right to counsel does not have an unequivocal right to revoke his *pro se* status. *People v. Jones*, 2015 IL App (2d) 120717, ¶ 36. Rather, the matter rests within the trial court's discretion. *Id.* Particularly given the trial court's assessment in this case that defendant was attempting to delay the trial proceedings, we cannot find that the trial court abused its discretion in denying defendant's last-minute requests for reappointment of

counsel.  See *id.*  See also *People v. Pratt*, 391 Ill. App. 3d 45, 56 (finding no basis to question the trial court's conclusion that the defendant's request for the reappointment of counsel was made solely for the purpose of delay); *People v. Gibson*, 2017 IL App (1st) 143566, ¶ 26 (same).

¶ 67    Defendant further contends that the trial court erred in denying his request for standby counsel.  Again, defendant forfeited this issue by failing to raise it in his amended motion for a new trial.  He therefore must establish that both a clear or obvious error occurred and that either the evidence was closely balanced or that he was denied a fair trial.  *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 68    A *pro se* defendant does not have a right to standby counsel.  *People v. Allen*, 2024 IL App (1st) 221681, ¶ 64.  "The right of self-representation does not carry with it a corresponding right to legal assistance; one choosing to represent himself must be prepared to do just that." *People v. Simpson*, 204 Ill. 2d 536, 562 (2001).  A trial court does, however, have broad discretion to appoint standby counsel for advisory or other limited purposes and to determine the nature and scope of standby counsel's involvement.  *People v. Redd*, 173 Ill. 2d 1, 38 (1996). Standby counsel may assist a *pro se* defendant with routine evidentiary or procedural obstacles and ensure compliance with courtroom procedure and protocol.  *People v. Gibson*, 136 Ill. 2d 362, 378 (1990).  "Relevant criteria appropriately considered by a trial court in deciding whether to appoint standby counsel to assist a *pro se* defendant in a criminal case include the nature and gravity of the charge, the expected factual and legal complexity of the proceedings, and the abilities and experience of the defendant."  *Id.* at 380.  Whether the trial court erred in denying a request for standby counsel is reviewed for an abuse of discretion.  *Id.* at 379.

¶ 69    Based on our review of the record, we find that the trial court did not abuse its discretion in denying defendant's request for standby counsel.  Although defendant faced serious charges,

19

he did not identify an actual need for standby counsel. See *Pratt*, 391 Ill. App. 3d at 58 (rejecting the contention that the seriousness of the charge necessitated the appointment of standby counsel on the day of trial). See also *Allen*, 2024 IL App (1st) 221681, ¶ 65 (noting that the gravity of the charges and the length of the defendant's potential incarceration "alone is not enough to warrant reversal" of the trial court's decision not to appoint standby counsel). In his written motion for standby counsel, defendant did not explain what tasks he wanted standby counsel to perform. Rather, he generically referenced the "significant research and investigation" required in this case, and he asserted that standby counsel "would better enable Defendant to present evidence and cross examine witness[es]." To the extent defendant was seeking a sort of "hybrid" representation, the trial court was not required to permit such representation. See *People v. Pecoraro*, 175 Ill. 2d 294, 333 (1997). In any event, defendant's distrust of the Public Defender's Office suggests that the appointment of standby counsel could have resulted in additional difficulties at trial. See *Allen*, 2024 IL App (1st) 221681, ¶ 66 (expressing skepticism that defendant would have accepted standby counsel's assistance given defendant's repeated denigration of the abilities of APDs). See also *People v. Hood*, 2022 IL App (4th) 200260, ¶¶ 87-97 (discussing potential problems with appointing standby counsel).

¶ 70    For the foregoing reasons, we reject defendant's various challenges based on his self-representation and turn to the next claim of error.

¶ 71                    *Shooting of Officer Darnell Keel*

¶ 72    The jury found defendant guilty of multiple offenses as to Officer Darnell Keel: attempted first degree murder of a peace officer (720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/9-1(b)(1) (West 2014)); aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(2)(i) (West 2014)); and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(3) (West 2014)). At

sentencing, the trial court merged the aggravated battery and aggravated discharge convictions into the attempted murder conviction.

¶ 73    Defendant raises two primary contentions on appeal relating to these convictions. He initially maintains that the conviction for attempted first degree murder should be reduced to aggravated battery since the evidence was insufficient to establish that he specifically intended to kill Officer Keel.  Defendant also argues that the evidence was insufficient to establish that he knew or should have known that Officer Keel was a peace officer, as relevant to his convictions for attempted murder, aggravated battery, and aggravated discharge of a firearm as to Officer Keel.[5]  The State contends, and we agree, that we should not consider defendant's arguments relating to the aggravated battery and aggravated discharge convictions if we sustain his attempted first degree murder conviction.  See *People v. Relerford*, 2017 IL 121094, ¶ 75 (holding that the appellate court lacked jurisdiction to decide the validity of the defendant's unsentenced convictions).

¶ 74    The standard of review for a challenge to the sufficiency of the evidence is well-settled. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002).  When reviewing a challenge to the sufficiency of the evidence, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  (Emphasis in original.)  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Accord *People v. Cunningham*, 212 Ill. 2d 274, 278-79 (2004).  The same standard of review applies when reviewing the sufficiency of the evidence in all criminal cases, regardless of whether the evidence is direct or circumstantial, and regardless of whether the defendant received a jury or a bench trial.  *People v. Brown*, 2013 IL 114196, ¶¶ 48-49.

---

[5] We note that defendant does not challenge his conviction for aggravated discharge of a firearm as to Officer Wallace.

¶ 75    When reviewing the sufficiency of the evidence in a criminal case, all reasonable inferences must be drawn in favor of the prosecution. *People v. Jones*, 2023 IL 127810, ¶ 32. The trier of fact is "not required to disregard inferences that flow normally from the evidence before it, nor must the trier of fact search out all possible explanations consistent with innocence and raise those explanations to a level of reasonable doubt." *People v. Eubanks*, 2019 IL 123525, ¶ 95. A criminal conviction will not be reversed unless the evidence is so unsatisfactory or improbable as to justify a reasonable doubt as to the defendant's guilt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009).

¶ 76    To sustain a conviction for the attempted murder of a peace officer, the State must establish beyond a reasonable doubt that the defendant (1) performed an act constituting a substantial step toward the commission of a murder, (2) possessed the criminal intent to kill the victim, and (3) knew or reasonably should have known that the victim was a peace officer in the course of performing his official duties. *People v. Kidd*, 2014 IL App (1st) 112854, ¶ 28 (citing 720 ILCS 5/8-4(a), 9-1(a)(1), (b)(1) (West 2010)). As to the second element, "nothing less than intent to kill" is required for an attempted first degree murder conviction. *People v. Hopp*, 209 Ill. 2d 1, 13 (2004). See also *People v. Guy*, 2025 IL 129967, ¶ 53. While defendant contends that the record contains "no direct evidence" that he specifically intended to kill Officer Keel, courts have recognized that "because the specific intent to take a life is a state of mind, it is rarely proven through direct evidence." *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52. "The specific intent to kill may be inferred from the circumstances, such as the character of the assault on the victim and use of a deadly weapon." *People v. Jones*, 184 Ill. App. 3d 412, 429 (1989).

¶ 77    Viewed in the light most favorable to the State, the evidence herein was sufficient to

establish that defendant possessed the criminal intent to kill Officer Keel. Defendant fired his weapon at Keel. "Firing a gun at a person supports the conclusion that the person doing so acted with the intent to kill." *People v. Brown*, 341 Ill. App. 3d 774, 781 (2003). We further note that defendant fired multiple shots. *People v. Bailey*, 265 Ill. App. 3d 262, 273 (1994) (finding that the defendant's conduct in firing multiple shots down a breezeway where several people were running was sufficient to prove a specific intent to kill). While defendant contends that the State "did not prove an intent to kill by showing that Keel's injuries were life-threatening," the fact that the injuries were not more severe was not dispositive. See *People v. Teague*, 2013 IL App (1st) 110349, ¶ 27 (noting that "[p]oor marksmanship is not a defense to attempted murder"). The jury was not required to believe that defendant fired the shots for some reason other than an intent to kill. *People v. Green*, 339 Ill. App. 3d 443, 452 (2003) (stating that the "decision as to which of competing inferences to draw from the evidence is the responsibility of the trier of fact"). Based on the evidence adduced at trial, a rational jury could have found beyond a reasonable doubt that defendant intended to kill Officer Keel when he shot at him.

¶ 78    Defendant also maintains that Officer Keel conceded that he did not announce himself as a police officer but instead stated "did anybody here call the police." Without any evidence that Officer Keel or his partner wore uniforms, badges, or other law enforcement indicia, defendant argues that the State failed to prove beyond a reasonable doubt that defendant knew or should have known Officer Keel was a police officer. We reject defendant's contention.

¶ 79    Officer Keel was present at the scene and asked whether anyone had called the police. Furthermore, the other adult occupants of the house understood that Officer Keel was a police officer. Morris testified that "the police" knocked on the back door of Israel's house. When asked how he knew it was the police, Morris responded, "He said he was the police." A.J.

23

testified that "it was a police [*sic*] at the back door" and that she heard "police." Julian similarly testified that she heard someone state "[t]here's police out there," *i.e.*, at the back of the house. Defendant's subsequent action of walking A.J. to the front door and using her as a human shield also suggests that he knew that police officers were outside. Viewed in the light most favorable to the State, the evidence was sufficient to establish that defendant knew or reasonably should have known that Officer Keel was a police officer. See *Kidd*, 2014 IL App (1st) 112854, ¶ 28.

¶ 80    Based on the foregoing, we conclude that the evidence was sufficient to sustain defendant's conviction for attempted first-degree murder. We turn to his final claim of error.

¶ 81                                          *Admonishments*

¶ 82    Defendant contends that the trial court erred by neglecting to advise him that a failure to appear at trial would waive his right to confront witnesses, as provided in section 113-4(e) of the Code of Criminal Procedure of 1963 (Code). 725 ILCS 5/113-4(e) (West 2022). The State responds that the trial court substantially complied with section 113-4(e) by repeatedly admonishing defendant that the trial could proceed in his absence.

¶ 83    We initially observe that defendant forfeited this issue by failing to object to the admonishments or to raise the issue in his amended motion for a new trial. Therefore, under the plain error doctrine, defendant must establish that a clear or obvious error occurred and: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Piatkowski*, 225 Ill. 2d at 565. Defendant maintains that "[b]ecause trials *in absentia* are inherently unfair, an improper trial *in absentia* constitutes second-prong plain error." *E.g.*, *People v. Watson*, 109 Ill. App. 3d 880, 883-84 (1982).

¶ 84   A criminal defendant has a constitutional right to be present at all stages of his trial.

*People v. Phillips*, 242 Ill. 2d 189, 194 (2011).  The right to be present at trial is an implied right

under the United States Constitution, arising from the due process clause of the Fourteenth

Amendment.  *People v. Ryan*, 2024 IL App (2d) 220076, ¶ 25; U.S. Const., amend. XIV, § 1.

The Illinois Constitution expressly grants criminal defendants the right "to appear and defend in

person and by counsel."  Ill. Const. 1970, art. 1, § 8.  "Accordingly, both the federal constitution

and our state constitution afford criminal defendants the general right to be present, not only at

trial, but at all critical stages of the proceedings, from arraignment to sentencing."  *People v.*

*Lindsey*, 201 Ill. 2d 45, 55 (2002).

¶ 85   A defendant's voluntary absence from his trial, however, may be "construed as an

effective waiver of his constitutional right to be present and he may be tried and sentenced *in*

*absentia*, even if he is not specifically warned that this is a possible consequence of his absence."

*Phillips*, 242 Ill. 2d at 194-95.  Section 113-4(e) of the Code nevertheless provides a defendant

with a statutory right to be informed of the potential consequences of his failure to appear in

court when required.  725 ILCS 5/113-4(e) (West 2022); *Phillips*, 242 Ill. 2d at 195.

Section 113-4(e) provides that if a defendant pleads not guilty, "the court shall advise him at that

time or at any later court date on which he is present that if he escapes from custody or is

released on bond and fails to appear in court when required by the court that his failure to appear

would constitute a waiver of his right to confront the witnesses against him and trial could

proceed in his absence."  725 ILCS 5/113-4(e) (West 2022).

¶ 86   Although the trial court admonished defendant regarding a trial *in absentia*, it did not

specifically inform defendant that he would waive his right to confront witnesses by failing to

appear.  During the pendency of this appeal, the Illinois Supreme Court addressed this issue in

*People v. Hietschold*, 2025 IL 130716, which the State was granted leave to cite as additional authority. The *Hietschold* court noted that "because a defendant has no constitutional right to admonishments before he may waive the right to be present at trial, the trial court need only substantially comply with section 113-4(e) for the admonishments to be sufficient," *i.e.*, the trial court must communicate the statute's "essence." *Id.* ¶ 20. As in *Hietschold*, the issue herein is whether the trial court substantially complied with section 113-4(e), which is a question of law we review *de novo*. *Id.*

¶ 87　At his arraignment, the trial court informed defendant: "If you fail to appear in court on each and every court date, a warrant could issue for your arrest, you could be tried in your absence, and if you are convicted you could be sentenced in your absence." On the first day of trial, after noting that defendant chose to represent himself, the trial court stated:

> "You also have a right to attend your own trial, but if you don't want to be here for your own trial, you have a right to waive your right to be physically present. If you choose to exercise that and you don't want to be present for your own trial, then the trial will proceed the same as if you had escaped, fled. It's called trial *in absentia*. It means that the State has to prove the same as they would with a trial if you were here that you are guilty. And I would instruct the jury the same as I would if you were here that the burden is on the State. The defense doesn't have to prove anything."

We view the foregoing admonishments as substantially in compliance with section 113-4(e). As our supreme court noted in *Hietschold*, "the 'essence' of the admonishment about trial in absentia in section 113-4(e) is just that—the admonishment that a defendant's failure to appear at trial will not prevent the trial from proceeding in his absence." *Id.* ¶ 32. Such concept was plainly and repeatedly explained to defendant.

26

¶ 88    In his response to the State's motion to cite additional authority, defendant argued that his case is "meaningfully different" from *Hietschold, i.e.*, as he was *pro se*, no one was available to cross-examine the State's witnesses when he was tried *in absentia*.  While we agree with defendant that the *Hietschold* court specifically recognized that an absent defendant "will retain the confrontation right to cross-examine witnesses through counsel" (*id.*), we disagree with his assessment that it was "critical" to our supreme court that the *Hietschold* defendant retained the confrontation right through counsel.  The *Hietschold* court expressly noted that "[t]here is an exception to the statutory requirement that an attorney must represent a defendant who is tried *in absentia*, in that the requirement does not apply to in-custody defendants who waive their right to counsel and also waive their right to be present by refusing to leave their cells."  *Id.* ¶ 31 n.3 (citing *People v. Eppinger*, 2013 IL 114121, ¶ 40).

¶ 89    The trial court in this case clearly expressed to defendant that the trial would occur without him if he chose not to attend.  "That a defendant will lose his ability to confront witnesses face-to-face is a corollary to the trial occurring without him."  *Id.* ¶ 32.  As the State accurately observes, "[g]iven this record, there is simply no probability that defendant would have attended trial if he was admonished about his right to confront witnesses."  We therefore reject defendant's challenge based on section 113-4(e) of the Code.

¶ 90                                              CONCLUSION

¶ 91    The judgment of the circuit court of Cook County is affirmed in its entirety.

¶ 92    Affirmed.